IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RICHARD BERGSRUD, M.D.,

       **Plaintiff,**

vs.                              **No. CIV 97-1339 LCS**

COLUMBIA-LEA REGIONAL MEDICAL
CENTER and COLUMBIA/HCA HEALTH CARE
CORPORATION, a foreign corporation,

       **Defendants.**

## MEMORANDUM OPINION

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 60),

filed May 23, 2000.  The Court, having considered the arguments of counsel, record, relevant law,

and being otherwise fully informed, finds that Defendant's Motion for Summary Judgment should be

**GRANTED.**

## I.  Background.

This case arises out of Defendant Columbia-Lea Regional Medical Center's (Hospital) refusal

to reinstate Plaintiff's associate medical staff privileges.  The following facts are undisputed unless

otherwise indicated.  Plaintiff has practiced medicine for over twenty-five years.  (Pl. Ex. 1 at 209.)

He is board-certified in orthopedic surgery.  (Pl. Ex. 2 at 11.)  In 1986, while living in Florida,

Plaintiff was hospitalized for a mental condition.  (Def. Ex.1 at 27-28.)  Plaintiff's Florida medical

license was suspended for a several months and then he was placed on a probationary status for four

to five years. (Def. Ex.1 at 22-23.)  In late 1993, Dr. Maldonado invited Plaintiff to join his orthopedic surgery practice in Hobbs, New Mexico.  (Pl. Ex. 1 at 36- 47.) Plaintiff accepted the offer and moved to Hobbs.  (*Id.*)  The New Mexico Board of Medical Examiners granted Plaintiff an interim permit to practice medicine, which required Plaintiff to undergo random lithium tests and provide quarterly reports from his treating psychiatrist.  (Def. Ex. 1, Dep. Ex.1.)

In 1994, Plaintiff applied for staff privileges at the Hospital.  (Def. Ex. 3 at 9.)  The Hospital requested additional information regarding Plaintiff's mental condition.  (Def. Ex. 3 at 11-12.)  Dr. Ronald Monteverde, Plaintiff's treating psychiatrist, submitted a letter stating that Plaintiff suffered from bipolar disorder for which he was receiving treatment.  (Def. Ex. 1, Ex. 4.)  Dr. Monteverde, who is on staff at the Hospital, (Pl.'s Ex. 2 at 65), concluded that Plaintiff's bipolar disorder appeared to be stable, and he did not see any symptoms of depression, mania or hypomania.  (Pl.'s Ex. 1 at 156.)  Plaintiff followed Dr. Monteverde's protocol of treatment, which included taking Tegretol and lithium, as well as undergoing counseling.  (*Id.*)

In June 1994, Plaintiff was granted associate staff privileges at the Hospital, with the limitation that he perform major joint replacement procedures only under the supervision of another individual holding full privileges to perform such procedures.  (Def. Ex. 1 at 73, 76.)  The Medical Staff By-Laws of the Hospital require that medical surgical procedures performed by all associate staff members be observed and evaluated to determine the member's qualifications and eligibility to advance to active medical staff privileges.  (Def. Ex. 7 at 7-8, 22-23, 37-40.)  Plaintiff received the same observation and review that would be given to any person holding associate staff privileges. (Def. Ex. 7 at 7-8, 22-23, 37-40.)

In September 1994, Plaintiff left his position with Dr. Maldonado and started his own

practice.  (Def. Ex. 1 at 73-74.)  The Hospital granted him a leave of absence while he opened his own orthopedic surgery practice. (*Id.*)  In October 1994, the Hospital reinstated Plaintiff's associate staff privileges.  (*Id.*)  In mid-1995, Dr. Monteverde stopped prescribing Tegretol to Plaintiff.  (Pl. Ex. 1 at 158-59.)

In September 1995, Plaintiff submitted an application for advancement to active medical staff privileges.  (Def. Ex. 1 at 74.)  In reviewing Plaintiff's application, the Hospital requested that Dr. Eugene Dabezies, an orthopedic surgeon with the Department of Orthopedic Surgery at Texas Tech University Health Sciences Center make a formal review of Plaintiff's performance as an orthopedic surgeon.  (Def. Ex. 5.)  Dr. Dabezies was not affiliated with the Hospital.  (*Id.*)  The Hospital regularly arranges such performance reviews of all physicians holding staff privileges, irrespective of whether or not they suffer from any mental or physical disorder.  (Def. Ex. 2.)  Dr. Dabezies reviewed the medical records and x-rays of twenty former patients of Plaintiff.  (Def. Ex. 5 at 2.)  Dr. Dabezies concluded that the patient care rendered by Plaintiff was "marginal at best." (Def. Ex. 5, Ex. A.)

On October 18, 1995, the Hospital held a meeting to allow Plaintiff the opportunity to discuss the cases reviewed by Dr. Dabezies.  (Def. Ex. 5 at 2.)  Plaintiff's mental condition or treatment was not raised at the meeting.  (Def. Ex. 5, Ex. B.)  The Hospital arranged for a second review of the care rendered by Plaintiff by Dr. James Benjamin, an orthopedic surgeon with the University of Arizona Health Sciences Center.  (Def. Ex. 5.)  In a report dated November 14, 1995, Dr. Benjamin concluded that the surgical techniques used by Plaintiff were not standard or current, and that Plaintiff had exercised poor judgment in the management of cases presented for his review.  (Def. Ex. 5, Ex. C.)

On November 8, 1995, two major joint replacements were canceled because Plaintiff failed

to arrange for the appropriate supervision required due to his associate staff status.  (Def. Ex. 4 at 31-32.)  On November, 28, 1995 Gladys Regan, a nurse at the Hospital, filed a Petition for Protective Order against Plaintiff, alleging that he had subjected her to verbal abuse.  (Def. Ex. 1 at 90, 94, Ex. 5.)  In December 1995, Plaintiff attempted to kiss nurses while they were on duty at the Hospital. (Def. Ex. 1 at 87-88.)  He also asked nurses for dates.  (Def. Ex. 1 at 90.)  On January 24, 1996, Susan Redding, a teacher who was not affiliated with the Hospital, filed a Petition for Protective Order against Plaintiff, alleging that he committed a series of harassing acts after she ended a dating relationship with him.  (Def. Ex. 1, at 99, Ex. 6.)

Hospital administrators met with Plaintiff in January 1996 to discuss his inappropriate behavior toward the nursing staff.  (Def. Ex. 1 at 115.)  Plaintiff apologized and stated it would not happen again.  (*Id.*)  In January 1996, after Plaintiff complained of insomnia, Dr. Monteverde again prescribed Tegretol.  (Pl. Ex. 1 at 158-59, 161.)  In Dr. Monteverde's opinion, the incidents involving Plaintiff in late 1995 and early 1996 were a bipolar, hypomanic, exacerbation (Pl. Ex. 1 at 188).

On January 26, 1996, Plaintiff requested and received a leave of absence from his associate staff privileges at the Hospital.  (Def. Ex. 5 at 2.)  In March 1996, Plaintiff requested reinstatement of his associate staff privileges.  (*Id.*)  In a letter dated November 8, 1996, the Executive Committee of the Medical Staff at the Hospital denied Plaintiff's request for reinstatement.  (Def. Ex. 5 Ex. D.) The denial was based upon review by the Credentials Committee in connection with alleged episodes of sexually harassing or inappropriate behavior as well as reports of aberrant behavior, previous reports regarding Plaintiff's clinical competence and judgmental ability in rendering patient care, and concerns about the current status of Plaintiff's ongoing psychiatric treatment and the apparent uncertainty surrounding the precise diagnosis of any psychiatric disorder.  (*Id.*)  The Hospital was

4

concerned that patient care and safety could be compromised by Plaintiff's actions or conduct.  (Def. Ex. 5 at 2.)

Plaintiff appealed the denial.  The Hospital held a hearing on July 16, 1997, at which Plaintiff was represented by counsel and presented evidence.  (Pl. Ex. 1.)  At the hearing, Dr. Howard Nunn, a radiologist at the Hospital, testified that he could not recall any instances of sloppy treatment, unwarranted surgery or inappropriate results in any of Plaintiff's patients.  (Pl. Ex. 1 at 147-49 .) Plaintiff's counsel argued that the reports of Dr. Dabezies and Dr. Benjamin were not supported and should be discounted because there was no showing that they practice medicine.  (Pl. Ex. 1 at 53-54.) Dr. Monteverde testified that Plaintiff's bipolar condition was stable and he was able to use good judgment to be able to practice medicine.  (Pl. Ex. 1 at 163.)  Dr. Coons testified that he had a "great question" as to Plaintiff's fitness for full active staff privileges, but acknowledged that Dr. Monteverde would be in the best position to evaluate Plaintiff's performance and condition. (Pl. Ex.1 at 256; 271.)

On August 18, 1997, the Hospital issued a Hearing Committee Report affirming the Executive Committee's recommendation that Plaintiff's application for reinstatement be denied.  (Pl. Ex. 10.) The Hearing Committee recommended that the decision be affirmed because it found that there was substantial evidence presented that Dr. Bergsrud acted in a manner inappropriate for a member of the medical staff, and that such behavior was disruptive to the operations of the Hospital, that his professional competence was questionable and that Dr. Bergsrud was suffering from a behavioral disorder the was not irrefutably under control.  (Pl. Ex. 10.)  On May 5, 1998, the Hospital Appellate Committee affirmed the Hearing Committee Report.  (Pl. Ex. 11.)

Plaintiff did not and has not requested any form of accommodation for his bipolar disorder.

5

(Def. Ex. 1 at 142-43.)

Plaintiff continued to see patients in his office practice in Hobbs until 1999. (Def. Ex. 1 at 47.) Due to the Hospital's refusal to reinstate his privileges, Plaintiff was forced to send patients to other providers approximately twice a month.  (Pl. Ex. 2 at 154; 158-59.)  Plaintiff recently opened a private orthopedic surgery practice in Ruidoso, New Mexico.  (Def. Ex. 1 at 33-34.) Since December 1999, Plaintiff has held medical staff privileges at Lincoln County Medical Center in Ruidoso.  (Def. Ex. 1 at 33.)

On February 16, 1996, Dr. William Ulwelling performed a psychiatric evaluation of Plaintiff. (Pl. Ex. 13.)  Dr. Ulwelling did not diagnose bipolar disorder, but instead opined that the sole period of emotional disturbance in Plaintiff's life occurred after a period of overwhelming stress. (*Id.*) Dr. Ulwelling attributed the symptoms that arose during the emotional disturbance to a mixed personality disorder with borderline antisocial traits. (*Id.*)  Dr. Ulwelling opined that Plaintiff was psychologically fit to practice medicine. (*Id.*)

On January 14, 2000, Dr. William Reid, Defendants' expert witness, issued a preliminary report. (Pl. Ex. 12.)  Plaintiff has submitted only the first page of this report.  Dr. Reid wrote that unspecified records sent for his review suggested that, as of the dates noted in the complaint and Dr. Ulwelling's report, Plaintiff was impaired with regard to the practice of medicine, and that awarding him unrestricted staff privileges would have placed patients at unacceptable risk. (*Id.*) Dr. Reid emphasized that his opinion was uncertain due to the absence of important corroborating information. (*Id.*)

Plaintiff is currently being treated by Dr. Monteverde.  (Pl. Ex. 2 at 23.) Plaintiff testified that he believed that the refusal to reinstate his staff privileges after his January 1996 leave of absence arose out of the Hospital's desire to protect the economic interests of Dr. Maldonado, the only other

orthopedic surgeon in Hobbs.  (Def. Ex. 1 at 57-59.)

In his Amended Complaint, filed April 30, 1998, Plaintiff alleged employment discrimination in violation of Title I of the Americans with Disabilities Act (ADA), 42 U.S.C, § 12101, *et seq.* (Count I), discrimination with respect to public accommodations in violation of Title III of the ADA (Count II), and violation of the Rehabilitation Act, 29 U.S.C. § 794 (Count III).  On September 1, 1998, Defendants served a Motion for Summary Judgment on all three claims.  On November 2, 1998, the Court granted Defendants' Motion for Summary Judgment with respect on Plaintiff's claim for employment discrimination under Title I, and denied that Motion with respect to Plaintiff's claims under Title III of the ADA and the Rehabilitation Act based on the record as developed at that time.

On March 30, 2000, Defendants served the instant Motion for Summary Judgment, arguing the Plaintiff cannot maintain his remaining claims as a matter of law.

## II.  Standard of Review.

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is proper when the pleadings, depositions, answers to interrogatories and admissions on file, as well as any affidavits "show that there is no genuine issue as to any material fact. " *Id.*  When applying this standard, the Court examines the record and reasonable inferences in the light most favorable to the non-moving party.  *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999).

If the moving party satisfies its initial burden, the party opposing the motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing there is a genuine issue for trial as to a dispositive matter for which it carries the burden of proof. *See Simms,* 165 F.3d at 1326. It is not sufficient "to simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. An issue of material fact is genuine if a reasonable jury could return a verdict for the party opposing the motion. *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1313 (10th Cir.1999). The substantive law at issue determines which facts are material in a given case. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

## III.  Analysis.

## A.      Defendant's Motion for Summary Judgment as to Plaintiff's Claim under Title III of the ADA.

Defendants assert they are entitled to summary judgment on Plaintiff's claim under Title III of the ADA, 42 U.S.C. § 12181, *et seq.*, (hereinafter Title III) because Plaintiff is not a qualified individual with a disability subject to the protection of Title III, the denial of medical staff privileges was not based upon Plaintiff's bipolar disorder, and Plaintiff cannot identify proposed accommodation

which would not fundamentally alter the essential functionality of the position of orthopedic surgery.

1.    **Whether Plaintiff is a qualified individual with a disability subject to the protection of Title III.**

Title III prohibits any person who owns, leases, or operates a place of public accommodation from discriminating against an individual on the basis of that individual's disability. *See* 42 U.S.C. § 12182(a). A plaintiff alleging discrimination under Title III must show (1) that he is disabled within the meaning of the ADA, (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation, (3) that defendant took adverse action against the plaintiff that was based upon the plaintiff's disability, and (4) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation. *See* 42 U.S.C. § 12182(a) and (b)(2)(A)(ii); *Amir v. St. Louis Univ*, 184 F.3d 1017 (8th Cir. 1999). The ADA imposes a statutory obligation to determine the existence of disabilities on a case-by-case basis, based upon the actual effect of the impairment on the life of the individual in question. *See Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, ____, 119 S. Ct. 2162, 2168 (1999). Bipolar disorder is a mental disability covered by the ADA. *See Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1081 (10th Cir. 1998). It is undisputed that defendant is a private entity that owns, leases, or operates a place of public accommodation. The remaining three elements are disputed.

Disability is defined by the ADA as (A) a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; (B) a record of a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; or (C) being regarded as having a physical or mental impairment that substantially limits one or more of the major life activities of such an individual. *See* 42 U.S.C. § 12102(2)(A-C). This definition of disability applies to the entire ADA, including Title III. *See* 42 U.S.C. § 12102.

Plaintiff asserts that while perhaps he could be considered disabled under (A) or (B), he contends that the strongest evidence suggests that Defendants regarded him as having a physical or mental impairment that substantially limits one or more of the major life activities under subsection (C). Plaintiff asserts that he is disabled under subsection (C) because Defendants regarded him as having an impairment that substantially limited the major life activities of working and thinking when they refused to reinstate his associate staff privileges.

The Supreme Court has stated that a person is regarded as disabled within the meaning of the ADA if "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, ____, 119 S. Ct. 2139, 2149-50 (1999). A "substantially limiting" disability is more than just a condition that makes one "different" from others. *Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, ____, 119 S. Ct. at 2168. Instead, the inability to enjoy a major life activity must be significantly restricted. *See Sutton*, 527 U.S. at ____, 119 S. Ct. at 2150-51. Moreover, mitigating or corrective measures must be taken into account in assessing whether an individual is disabled within the meaning of the ADA. *See Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, ____ 119 S. Ct. 2133, 2137 (1999). Persons whose impairments are largely corrected by medication or other devices are not 'disabled' within the meaning of the ADA. *See Sutton*, 527 U.S. at ____, 119 S. Ct. at 2148.

    **(a)**    **Whether working and thinking constitute major life activities within the meaning of 42 U.S.C. § 12102(2).**

Defendant asserts that Plaintiff is not disabled within the meaning of the ADA because his

bipolar disorder does not substantially limit a major life activity.[1]  Plaintiff contends that his bipolar disorder substantially limited the major life activities of working and thinking. The ADA does not define the term "major life activity."  That term has been construed to mean a "basic activity that the average person in the general population can perform with little or no difficulty."  *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir.1999).  Major life activities include such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working.  *See Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.*,168 F.3d 1228, 1231-32 (10th Cir.1999).

In determining whether a particular activity constitutes a "major life activity," the Court must ask "whether that activity is *significant within the meaning of the ADA*, rather that whether that activity is important to that particular individual."[2]  *Pack v. Kmart Corp.*, 166 F.3d at 1305 (10th Cir. 1999) (emphasis added).  Concentration is not a major life activity within the meaning of the ADA. *See Pack v. Kmart Corp.*, 166 F.3d at 1305 (10th Cir. 1999).  While the Tenth Circuit recently declined to find that thinking qualifies as a major life activity within the meaning of the ADA,  *see Doyal v. Oklahoma Heart, Inc.*, ____ F.3d ____, 2000 WL 633239 (10th Cir. May 17, 2000), the distinction between concentrating and thinking is not apparent.[3]  In the absence of controlling

---

[1]  Although Plaintiff primarily argues that he qualifies a disabled under subsection (C), the Court notes that Subsections (A) and (B) also require Plaintiff to demonstrate either a physical or mental impairment that substantially limits one or more of the major life activities or that he has a record of having such an impairment.  *See* 42 U.S.C. § 12102(2)(A-C).

[2]  The purpose of Title III is to extend the protections of the Rehabilitation Act to privately operated public accommodations and to bring individuals with disabilities into the economic and social mainstream of American life.  *See* H.R.485 (II), 101st Cong. at 11 (1990).  In enacting Title III, Congress considered that "an overwhelming majority of individuals with disabilities lead isolated lives and do not frequent places of public accommodation."  *Id.*

[3]  In deciding this Motion, it was difficult, if not impossible to tell where my "thinking" left off and my "concentrating" began.

authority, the Court is reluctant to hold that thinking constitutes a major life activity within the meaning of the ADA. However, the Court will presume for the purposes of this analysis that thinking does qualify as a major life activity.

> **(b)      Whether Plaintiff's bipolar disorder substantially limited a major life activity within the meaning of 42 U.S.C. § 12102(2)(A) or (B).**

The next question is whether Plaintiff's bipolar disorder substantially limits his ability to work. In order for a physical or mental impairment to be substantially limiting, the individual must be: (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. *See* 29 C.F.R. § 1630.2(j)(1); *Sutton*, 527 at ____, 119 S. Ct. at 2151.

An impairment affecting the ability to work does not substantially limit a major life activity unless the individual is precluded from a broad range of jobs. *See Sorenson v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1088 (10th Cir. 1999) (holding that nurse, who had multiple sclerosis, was not disabled under subsection (C) because she alleged preclusion only from position as flight nurse); *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1175-76 (10th Cir. 1997) (holding that worker, who was unable to work within chain of command of certain supervisor due to severe depression and anxiety, was not disabled because he was not prevented from performing broad class of jobs); *Welsh v. City of Tulsa*, 977 F.2d 1415, 1419 (10th Cir. 1992) (holding that impairment perceived by employer as limiting individual's ability to perform only one job is not a disability).  Similarly, the "inability to pursue one career, such as medicine, does not constitute a severe impact on an individual's life." *McGuinness v. Univ. of New Mexico Sch. of Med.*, 170 F.3d 974, 979 (10th Cir.1998) (holding that medical student, who had anxiety disorder that manifested itself when he took chemistry and math

tests, was not disabled because student failed to demonstrate that condition impeded performance in wide variety of disciplines).

Defendant asserts that Plaintiff has practiced orthopedic medicine throughout the relevant period. From 1994 to 1999, Plaintiff maintained an orthopedic medicine office practice in Hobbs. (Def. Ex.1 at 47.) Plaintiff has recently established a private orthopedic surgery practice in Ruidoso and obtained hospital privileges at the Lincoln County Medical Center. (Def. Ex. 1 at 33.) Dr. Monteverde testified that Plaintiff's bipolar condition was stable and that Plaintiff was able to exercise good judgment and practice medicine. (Pl.'s Ex. 1 at 163.) This evidence indicates that Plaintiff's ability to work was not substantially limited. Defendants have met their initial burden under Rule 56 of showing that Plaintiff's bipolar disorder did not substantially limit the major life activity of working. *See Adickes v. S.H. Kress & Co.*, 398 U.S. at 157. The burden then shifted to Plaintiff to demonstrate a genuine issue for trial on a material matter. *See Celotex v. Catrett*, 477 U.S. at 323.

In response, Plaintiff asserts that, because the Hospital was the only facility that would allow him to practice his specialty of orthopedic surgery in Hobbs, he was foreclosed from working. Plaintiff also asserts that the Hospital perceived that he was substantially limited in his ability to work. Plaintiff does not dispute that he has continued to practice medicine in Hobbs after the Hospital declined to reinstate his staff privileges. Plaintiff also does not dispute that he currently practices in Ruidoso and holds privileges at a hospital there. Because Plaintiff was able to work, and did work, as a physician at all relevant times, his condition did not substantially limit his ability to work. Plaintiff was not substantially limited in the major life activity of working merely because he was barred from using the Hospital's facilities. *See Sorenson v. Univ. of Utah Hosp.*, 194 F.3d at 1088; *Siemon v. AT&T Corp.*, 117 F.3d at 1175-76; *Welsh v. City of Tulsa*, 977 F.2d at 1419.

As discussed *supra,* the Tenth Circuit has not determined that thinking constitutes a major

life activity. (*See* discussion *supra* Part III.A.1.a.) However, assuming that thinking constitutes a major life activity, Plaintiff has failed to establish that his mental condition substantially limited his ability to think. Dr. Monteverde testified that Plaintiff's bipolar condition was stable and that Plaintiff was able to exercise good judgment and practice medicine. (Pl.'s Ex. 1 at 163.) This opinion indicates that Plaintiff's ability to think was not significantly limited. The burden thus shifted to Plaintiff to demonstrate a material issue of fact for trial.

In response, Plaintiff relies on the testimony of Dr. Coons and the first page of Dr. Reid's preliminary report. Dr. Coons testified that he had a "great question" as to Plaintiff's fitness for full active staff privileges, but acknowledged that Dr. Monteverde would be in the best position to evaluate Plaintiff's performance and condition. (Pl. Ex.1 at 256; 271.) In the first page of his preliminary report, Dr. Reid wrote that unspecified records sent for his review suggested that, as of the dates noted in the complaint and Dr. Ulwelling's report, Plaintiff was impaired with regard to the practice of medicine, and that awarding him unrestricted staff privileges would have placed patients at unacceptable risk. (*Id.*) Dr. Reid emphasized that his opinion was uncertain due to the absence of important corroborating information. (*Id.*) Moreover, the complete Reid report is not before the Court. This evidence does not establish that Plaintiff's ability to think was substantially limited. Plaintiff has failed to meet his burden to introduce evidence sufficient to create a genuine issue of material fact as to whether he had a significant impairment of his ability to think.

Viewing the evidence in the light most favorable to Plaintiff, I find that there is no issue of material fact as to whether Plaintiff's mental impairment substantially limited a major life activity. Furthermore, Plaintiff produced no record of such an impairment as required by Subsection (B). Therefore, Plaintiff has not established a disability within the meaning of 42 U.S.C. § 12102(2)(A) or (B).

(c)     **Whether Plaintiff was regarded as disabled within the meaning of 42 U.S.C. § 12102(2)(C)?**

In his brief, Plaintiff relies heavily on the "regarded as" aspect of Subsection (C).  Plaintiff asserts that Defendants regarded him as having an impairment that substantially limited the major life activities of working and thinking when they refused to reinstate his associate staff privileges. Plaintiff appears to argue that he can establish disability by showing Defendants regarded him as having bipolar disorder.  However, subsection (C) is much broader than that.  In order to establish disability within the meaning of Subsection (C), Plaintiff must show that Defendants regarded him as having an impairment that *substantially limited one or more of the major life activities*.  *See* 42 U.S.C. § 12102(2)(C) (emphasis added).

In order to establish that he is regarded as disabled within the meaning of Subsection (C), Plaintiff must show (1) the Hospital mistakenly believed that Plaintiff had an impairment that substantially limited his ability to think or work, or (2) the Hospital mistakenly believed that his actual, nonlimiting impairment substantially limited his ability to think or work.  *See Sutton v. United Airlines, Inc.*, 527 U.S.471, ____, 119 S. Ct. 2139, 2149-50 (1999).

Plaintiff is unable to establish the first alternative of Subsection (C).  The evidence of record unequivocally established that Plaintiff had a mental disorder.  Because there is no genuine issue of fact concerning this issue, the Hospital did not mistakenly believe that Plaintiff was suffering from a mental impairment.  Therefore, the first alternative method of establishing that the Hospital regarded Plaintiff as having an impairment that substantially limited his ability to think and work is not applicable.

In order to establish the second alternative, Plaintiff must show that the Hospital mistakenly believed that his actual, nonlimiting impairment (to wit, a mental disorder) substantially limited his ability to work.  With respect to the second alternative method, the issue is whether the Hospital

believed (and in fact was mistaken in that belief) that Plaintiff's mental disorder substantially limited his ability to work.  Defendants' entire position is based on the premise that Plaintiff *was able* to work and think and the Hospital was well aware of the fact that Plaintiff was practicing medicine during this period of time.  The Hospital correctly believed that Plaintiff was able to work during the relevant period.  In fact, Plaintiff *did* work during the relevant period and *continues* to work.  (*See* discussion *supra* Part III.A.1.b.)  Assuming that thinking constitutes a major life activity, it is clear that Plaintiff was able to think during the relevant period as it is undisputed that he was practicing medicine at all relevant times.  (*See* discussion *supra* Part III.A.1.b.)  The Hospital correctly believed that Plaintiff's ability to think was not substantially limited by his mental disorder.

No genuine issue remains to be tried as to whether the Hospital believed that Plaintiff's mental impairment substantially limited a major life activity.  At best, Plaintiff presented evidence that the Hospital believed he could not perform up to their standards.  That does not suffice to show that he was regarded as substantially limited in working or thinking.  *See Sorenson v. Univ. of Utah Hosp.*, 194 F.3d at 1088; *Siemon v. AT&T Corp.*, 117 F.3d at 1175-76; *Welsh v. City of Tulsa*, 977 F.2d at 1419.  Therefore, the second alternative method of establishing that the Hospital regarded Plaintiff as having an impairment that substantially limited a major life activity is not applicable.

Plaintiff has not established that his bipolar disorder or other mental impairment substantially limited a major life activity, a record of such an impairment, nor that Defendants regarded him as having such an impairment.  Viewing the evidence in the light most favorable to Plaintiff, I find that he has failed to established a genuine issue of material fact as to whether he was disabled within the meaning of the ADA.  *See* 42 U.S.C. § 12102(2)(A-C).  Therefore, Defendants' Motion for Summary Judgment should be granted with respect to Plaintiff's Title III ADA claim.

**B.      Defendant's Motion for Summary Judgment as to Plaintiff's Claims under the Rehabilitation Act.**

Defendants assert that they are entitled to summary judgment with respect to Plaintiff's claim under the Rehabilitation Act.  The Rehabilitation Act provides in pertinent part:

> No otherwise qualified individual with a disability in the United States shall, solely by reason of her or his disability be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C.A. § 794(a).

Handicap status alone is an impermissible ground for assuming a person's inability to function in a particular context.  *See Southeastern Community College v. Davis*, 442 U.S. 397, 405 (1979). A decision is made solely by reason of a handicap if the decision is based either on the handicap itself or on conduct resulting from the handicap.  *See Teahan v. Metro-North Commuter R.R. Co.*, 951 F.2d 511, 515-17 (2d Cir.1991).  In order to prevail on a Rehabilitation Act claim, a plaintiff must establish that (1) he is a handicapped person under the Act; (2) he is otherwise qualified; (3) he was discriminated against solely on the basis of his handicap; and (4) the defendant receives federal funds. *See Johnson v. Thompson*, 971 F.2d 1487, 1492 (10th Cir. 1992).  Without proof that a defendant acted solely on the basis of his handicap, a plaintiff cannot establish a *prima facie* case.  *Landefield v. Marion Gen. Hops., Inc.*, 994 F.2d 1178, 1181 (6th Cir. 1993).  "The word solely provides the key: the discrimination must result from the handicap and from the handicap alone."  *Johnson v. Thompson*, 971 F.2d at 1493.

Defendants argue they are entitled to summary judgment because Plaintiff is unable to show they acted solely on the basis of his alleged disability.  Plaintiff testified that he believed that the refusal to reinstate his staff privileges after his January, 1996 leave of absence arose out of the Hospital's desire to protect the economic interests of Dr. Maldonado, the only other orthopedic

surgeon in Hobbs. (Def. Ex. 1 at 57.) The independent physicians retained to evaluate Plaintiff's professional competence concluded that the patient care rendered by Plaintiff was "marginal at best," that the surgical techniques used by Plaintiff were not standard or current, and that Plaintiff had exercised poor judgment in the management of cases presented for his review. (Def.'s Ex. 5, Ex. A and Ex. C.) The Hospital based its decision to deny reinstatement of Plaintiff's privileges not only on reports of sexual harassment, inappropriate behavior, and uncertainty surrounding the current status of any psychiatric disorder, but also on reports regarding Plaintiff's lack of clinical competence. (Defs.' Ex. 5 at 3.) This evidence, as well as Plaintiff's own testimony regarding Dr. Maldonado, tends to establish that the Hospital's decision was not based solely on any alleged disability.

Defendants have met their initial burden under Rule 56 based on the record as presently developed. *See Adickes v. S.H. Kress & Co.*, 398 U.S. at 157. The burden then shifted to Plaintiff to demonstrate a genuine issue for trial on a material matter. *See Celotex v. Catrett*, 477 U.S. at 323. In response to Defendants' showing, Plaintiff submitted a document purportedly authored by Dr. Jerry Cochran. (Pl.'s Ex. 7.) However, this document is not sworn and clearly states that Dr. Cochran is unable "to testify in court or at hearing, to participate in depositions or to correspond with attorneys in any way." (Pl.'s Ex. 7 at 1.)

Rule 56 provides that any affidavits submitted in opposition to a properly supported motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). Therefore, by it own terms, the document purportedly authored by Dr. Cochran, and submitted as Plaintiff's Exhibit 7, does not meet the requirements of Rule 56(e). Although all doubts must be resolved in favor of Plaintiff, conclusory allegations standing alone do not defeat a properly supported motion for summary judgment. *See White v. York Int'l*

*Corp.*, 45 F.3d 357, 363 (10th Cir. 1995) (*citing Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526,

530 (10th Cir.1994)).  Plaintiff asserts that the decision was not based solely on his disability through

his assertion that the Hospital denied him reinstatement in order to protect Dr. Maldonado from

competition.  Viewing the record in the light most favorable to Plaintiff, I find that Plaintiff has failed

to established a genuine dispute of material fact as to whether he was discriminated against solely on

the basis of his alleged handicap.  Therefore, Defendants' Motion for Summary Judgment should be

granted with respect to Plaintiff's Rehabilitation Act claim.

In light of these determinations, it is not necessary to reach Defendants' remaining arguments.

## IV. Conclusion.

Upon review of the evidence presented on this Motion for Summary Judgment, the Court

finds that Plaintiff has failed to established a genuine dispute of material fact with respect to his claims

under Title III and the Rehabilitation Act.  Therefore, Defendants' Motion for Summary Judgment

shall be **GRANTED.**

**AN ORDER CONSISTENT WITH THIS OPINION SHALL ISSUE.**

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**